**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| Dakota West Credit Union, | ) | |
| | ) | **ORDER GRANTING DEFENDANT'S MOTION** |
| Plaintiff, | ) | **FOR SUMMARY JUDGMENT AND DENYING** |
| | ) | **PLAINTIFF'S MOTION FOR SUMMARY** |
| vs. | ) | **JUDGMENT** |
| | ) | |
| CUMIS Insurance Society, Inc., | ) | |
| | ) | Case No. 1:07-cv-016 |
| Defendant. | ) | |

Before the Court is the defendant CUMIS Insurance Society, Inc.'s Motion for Summary Judgment filed on November 1, 2007. The plaintiff, Dakota West Credit Union, filed a cross-motion for summary judgment and supporting memorandum on December 5, 2007. CUMIS filed a reply brief on December 12, 2007. For the reasons outlined below, the Defendant's motion for summary judgment is granted, and the Plaintiff's motion is denied.

**I.   BACKGROUND**

This is a coverage dispute involving the interpretation of a bond issued by the defendant, CUMIS Insurance Society, Inc. (CUMIS), to the plaintiff, Dakota West Credit Union (Dakota West). Dakota West contends that CUMIS must indemnify Dakota West under the terms of the bond. Dakota West advanced $950,000 to an entity known as H&J Livestock, LLC, in reliance on a faxed copy of an unsigned "Buyer's Bill." The "Buyer's Bill" appeared to be from Lake Region Livestock, a livestock ring in Devils Lake, North Dakota, and stated that H&J Livestock had purchased 1,276 steers. See Docket No. 17-2. H&J Livestock subsequently defaulted on the loan and Dakota West discovered that H&J Livestock had never purchased 1,276 steers as represented on the "Buyer's Bill."

CUMIS contends that the bond does not provide coverage because the faxed, unsigned "Buyer's Bill" is not a forgery, a counterfeit, or a document of title as required under the bond to invoke coverage. Dakota West contends that the bond provides coverage because the loan was based on a counterfeit document of title, i.e., the "Buyer's Bill."

The following facts are not in dispute. In April of 2005, Dakota West approved the fourth in a series of credit line loans to an entity known as H&J Livestock. See Deposition of Scott Kueffler, Docket No. 17-4, pp. 29-31. H&J Livestock was owned and operated by Todd Horob and James Johnson. Horob also owned a separate company known as Horob Livestock, Inc. Dakota West advanced $950,000 to H&J Livestock on April 15, 2005, in reliance on security agreements and guarantees executed by Todd Horob, James Johnson, and Horob Livestock in 2003, 2004, and 2005. Dakota West claims that the 2005 loan was also made in reliance on a faxed copy of a "Buyer's Bill" received from Todd Horob. See Docket Nos. 1 and 17-3. The "Buyer's Bill" purported to state that H&J Livestock had purchased 1,276 steers from Lake Region Livestock in Devils Lake, North Dakota. See Docket No. 2. Prior to advancing $950,000 in loan funds, Dakota West never verified whether there was an actual sale of 1,276 steers to H&J Livestock. See Docket No. 17-3, ¶ 16.

Dakota West admits that H&J Livestock did not purchase 1,276 steers from Lake Region Livestock on April 15, 2005. Rather, Todd Horob obtained a blank Lake Region Livestock "Buyer's Bill," filled it out himself, and then faxed it to the Dakota West branch office in Grenora, North

Dakota.[1]  The "Buyer's Bill" was not signed.  The "Buyer's Bill" did not contain the signature of the owner, consignor, or seller of the cattle purportedly being sold.  The "Buyer's Bill" did not contain the signature of a person over the age of 18 who verified the name and signature of the seller.  The "Buyer's Bill" did not include a North Dakota brand inspector's certification or the signature of a branch inspector.  The faxed "Buyer's Bill" did not even include the signature of the

---

[1] A copy of the "Buyer's Bill" is reproduced below.



**BUYER'S BILL**

Sale Each Tuesday

**LAKE REGION LIVESTOCK**

P.O. Box 1198 • Devils Lake, ND 58301 • Phone: (701) 662-2223

DATE  4-15-05

SOLD TO  H & J Livestock LLC
         Box 3015  Wolf Point MT 59201

BUYER

PEN NO.

NO. CATTLE  1276
NO. HOGS
NO. SHEEP

| CONSIGNOR NO. | PEN NO. | HD TAG | NO. HEAD | DESCRIPTION | WEIGHT | PRICE | TOTAL |
|---|---|---|---|---|---|---|---|
| 1 | | | 1276 | STRS | 852345 | 111  46 | 950023 73 |
| 2 | | | | | | | |
| 3 | | | | | | | |
| 4 | | | | | | | |
| 5 | | | | | | | |
| 6 | | | | | | | |
| 7 | | | | | | | |
| 8 | | | | | | | |
| 9 | | | | | | | 950023 73 |
| 10 | | | | | | | |
| 11 | | | | | | | |
| 12 | | | | | | | |
| 13 | | | | | | | |
| 14 | | | | | | | |
| 15 | | | | | | | |
| 16 | | | | | | | |
| 17 | | | | | | | |
| 18 | | | | | | | |
| 19 | | | | | | | |
| 20 | | | | | | | |
| 21 | | | | | | | |
| 22 | | | | | | | |
| 23 | | | | | | | |
| 24 | | | | | | | |

Total Weight           Veterinary Service
Average Cost Per Head  Trucking
Average Cost Per Pound Commission
Average Weight         Other

TOTAL  950023 73

ERRORS CHEERFULLY CORRECTED  •  BONDED FOR YOUR PROTECTION  •  WE ACT AS AGENTS ONLY

purported buyer, H&J Livestock.  Further, the "Buyer's Bill" did not identify the steers by pen number, consignor number, tag number, or brand.  See Docket No. 17-2.

On April 13, 2006, Dakota West received notice that Todd Horob and Horob Livestock had filed for bankruptcy.  See Docket No. 17-6, ¶ 16.  H&J Livestock made no payments on the subject loan which came due on April 15, 2006.  On May 23, 2006, Dakota West filed suit against H&J Livestock and James C. Johnson in Williams County District Court.  See Docket No. 17-6, ¶ 18.  On June 16, 2006, Dakota West obtained a judgment against H&J Livestock for $1,083,051.90.  Following Dakota West's repossession and sale of various collateral, the amount of the unsatisfied judgment was $895,820.69.  Dakota West has filed claims and has adversarial proceedings pending in the bankruptcies of Todd Horob and Horob Livestock, Inc.  See Docket Nos. 17-5 and 17-6.  The record reveals that Dakota West has recovered approximately $212,000 through the Horob bankruptcy proceedings.  See Deposition of Denton Zubke, Docket No. 17-5, pp. 91-92.

On August 24, 2006, Dakota West submitted a formal claim to CUMIS for the subject loan loss under its "Credit Union Bond."    See Docket No. 17-9.  CUMIS denied coverage.  It is undisputed that the bond issued by CUMIS to Dakota West was in effect from August 14, 2005, until August 14, 2006.  The bond is a legally enforceable contract between CUMIS and Dakota West.  It is also undisputed that Dakota West "discovered" its loan loss in April of 2006.

CUMIS contends that Dakota West's loss on the loan to H&J Livestock is not a covered claim under the bond.  CUMIS contends that the loss is not covered by the bond's "Counterfeit Share Draft, Check or Securities" coverage provision.  Second, CUMIS contends that the loss is also not covered by the bond's "Forgery or Alteration" provision.  Finally, CUMIS contends that even

if the loss satisfies any of the coverage provisions of the bond, the loss is excluded from coverage because the loan was obtained through fraud or false pretenses.

Dakota West contends that the loan loss is covered under the "Counterfeit Share Draft, Check, or Securities" provision of the bond. Dakota West concedes that CUMIS is entitled to summary judgment on Dakota West's claim under the bond's "Forgery or Alteration" provision. Dakota West has not addressed the applicability of the exclusionary clause. Both parties acknowledge that there are no disputed factual issues and that the interpretation of the bond is a question of law for the Court to resolve.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. If the moving party has supported its motion for summary judgment, the non-moving party has an affirmative burden placed on it to go beyond the pleadings and show a genuine triable issue of fact. Commercial Union Ins. Co. v. Schmidt, 967 F.2d 270, 271 (8th Cir. 1992). However, the court considering a motion for summary judgment must view the evidence in the light most favorable to the non-moving party who enjoys "the benefit of all reasonable inferences to be drawn from the facts." Vacca v. Viacom Broadcasting of Missouri, Inc., et al., 875 F.2d 1337, 1339 (8th Cir. 1989).

### III.   LEGAL ANALYSIS

This action is based on diversity jurisdiction. The Court will apply the substantive law of North Dakota. Paracelsus Healthcare Corp. v. Philips Med. Sys., 384 F.3d 492, 495 (8th Cir. 2004). In the absence of controlling North Dakota law, the Court is obligated to predict what North Dakota law is based on "relevant state precedent, analogous decisions, considered dicta, . . . and any other reliable data." Bockelman v. MCI Worldcom, 403 F.3d 528, 530 (8th Cir. 2005) (quoting BoBass v. Gen. Motors Corp., 150 F.3d 842, 846-47 (8th Cir. 1998)).

It is well-established in North Dakota that the interpretation of an insurance policy is a question of law. Fisher v. American Family Mutual Ins. Co., 579 N.W.2d 599 (N.D. 1998). The standard for construing an insurance contract in North Dakota is as follows:

> Our goal when interpreting insurance policies, as when construing other contracts, is to give effect to the mutual intention of the parties as it existed at the time of contracting. We look first to the language of the insurance contract, and if the policy language is clear on its face, there is no room for construction. "If coverage hinges on an undefined term, we apply the plain, ordinary meaning of the term in interpreting the contract." While we regard insurance policies as adhesion contracts and resolve ambiguities in favor of the insured, we will not rewrite a contract to impose liability on an insurer if the policy unambiguously precludes coverage. We will not strain the definition of an undefined term to provide coverage for the insured.

ACUITY v. Burd & Smith Const., Inc., 721 N.W.2d 33 (N.D. 2006) (quoting Ziegelmann v. TMG Life Ins. Co., 607 N.W.2d 989 (N.D. 2000)).

#### A.   THE CREDIT UNION BOND

Dakota West provided no response to CUMIS's motion for summary judgment that the subject bond does not provide coverage under the "Forgery or Alteration" provision. The record reveals that Dakota West has conceded its claim for coverage under this provision of the bond. See

6

Docket Nos. 17-12 and 23.  Dakota West bases its sole contention for coverage on the "Counterfeit Share Draft, Check or Securities" provision of the bond which provides as follows:

> 1. We will pay you for your loss resulting directly from a "counterfeit" share draft or check other than a money order which was finally paid against your corporate share or checking account or a share draft or checking account your member has with you.
>
> 2. We will pay you for your loss resulting directly from having, in good faith, for your own account or the accounts of others acquired, sold or delivered, or given value, extended credit or assumed liability in reliance on any "counterfeit":
>
>    a. "Certificated security"; or
>
>    b. Deed, mortgage, or other instrument conveying title to, or creating or discharging a lien on, real property; or
>
>    c. Certificate of Origin or Title issued by a manufacturer or personal property or governmental agency evidencing the ownership of the personal property and by which ownership is transferred; or
>
>    d. "Document of title."
>
> Actual physical possession, and continued actual physical possession if taken as collateral, of such "counterfeit" by you or your authorized representative is a condition precedent to your reliance upon it.  If taken as collateral, release or return of such "counterfeit" is your acknowledgment that you no longer rely upon it.

See Docket No. 17-10, p. 18.

CUMIS argues that to trigger coverage under the "Counterfeit Share Draft, Check or Securities" provision of the bond, Dakota West must demonstrate: (1) a loss; (2) resulting directly from; (3) having in good faith; (4) extended credit in reliance on; (5) a "counterfeit"; (6) "document of title"; (7) of which Dakota West has taken actual physical possession.  CUMIS argues that there is no basis for coverage because the "Buyer's Bill" was not a counterfeit document, the "Buyer's

7

Bill" was not a document of title, the loss did not result directly from reliance on the "Buyer's Bill", and Dakota West never took actual physical possession of the bill.

### B.  DEFINITION OF COUNTERFEIT

The term "counterfeit" is defined in the credit union bond issued by CUMIS.  As such, that definition controls the coverage analysis.  See Nationwide Mut. Ins. Cos. v. Lagodinski, 683 N.W.2d903, 908, 910 (N.D. 2004) (providing that the court looks first at the language of the insurance contract to determine whether coverage existed); see also Alpine State Bank v. Ohio Cas. Ins. Co., 941 F.2d 554, 560 (7th Cir. 1994) (stating that it is well accepted that definitions contained within the policy are controlling).  The term "counterfeit" is defined in the bond as follows:

13.    **Counterfeit**

"**Counterfeit**" means an imitation which is intended to deceive and to be taken as an original.

See Docket No. 17-10, p. 23.

North Dakota has not construed the definition of "counterfeit" as contained in the subject bond.  Numerous other courts have interpreted the same definition of "counterfeit," and have established a consistent line of authority.  Those courts have held that the definition of "counterfeit" requires a fake document that is an imitation or duplicate of a preexisting original document. Reliance Ins. Co. v. Capital Bancshares, Inc., 912 F.2d 756, 757 (5th Cir. 1990).  The claimed counterfeit must be an attempt to imitate a genuine document that is already in existence.  Id. at 758; French Am . Banking Corp. v. Flota Mercante Grancolombiana S.A., 752 F. Supp. 83, 92 (S.D.N.Y. 1990), aff'd, 952 F.2d 603 (2d Cir. 1991); Gateway State Bank v. N. River Ins. Co., 387 N.W.2d 344, 348 (Iowa 1986).

"Counterfeit" also means the imitation of an instrument that is authentic such that a party is deceived on the basis of the quality of the imitation. French Am. Banking Corp., 752 F. Supp. at 92; see Bank of the Southwest v. Nat'l Sur. Co., 477 F.2d 73, 76-77 (5th Cir. 1973)(holding that a "white slip" was not counterfeited because it did not purport to be a direct imitation of an authentic original "white slip"); Liberty Nat'l Bank v. Aetna Life & Cas., 568 F. Supp. 860, 864 (D.N.J. 1983) (holding that a fake certificate of deposit was not a counterfeit because it was not an imitation of a real certificate of deposit); Richardson Nat'l Bank v. Reliance Ins. Co., 491 F. Supp. 121, 123 (N.D. Tex. 1977), aff'd 619 F.2d 557 (5th Cir. 1980) (holding that there must be an original instrument in order for an imitation to be "counterfeit"); Nat'l City Bank of Minneapolis v. St. Paul Fire & Marine Ins. Co., 447 N.W.2d 171 (Minn. 1989).

In National City Bank of Minneapolis v. St. Paul Fire & Marine Insurance Co., 447 N.W.2d 171 (Minn. 1989), the Minnesota Supreme Court interpreted the same definition of "counterfeit" under a Bankers Blanket Bond (i.e. "an imitation which is intended to deceive and to be taken for an original"). The Minnesota Supreme Court noted that the definition of counterfeit was added to the Bankers Blanket Bond in 1969 in response to inconsistent interpretations of "counterfeit" in the courts. The court then cited and discussed post-1969 case law stating "[a]ll six of these decisions read the Bond's definition of 'counterfeited' to require the fake document be an imitation or duplicate of a preexisting original document." Id. at 178-179. The Minnesota Supreme Court reversed the ruling of the trial court and held that the bank was not entitled to indemnity under the bond because the stock certificates that the bank relied on were made on a standardized stock certificate form and were not imitations of genuine original stock certificates that had been issued. Id. at 180.

9

The rationale behind the definition of counterfeit is to equitably distribute the risks of doing business between the insurers and the insured.

> The basic rationale behind the definition of "counterfeit" is to require that an insurance company cover only non-business losses or insured risks, with a bank responsible for ordinary business losses. An insured bank is not covered for mere loan losses resulting from a failure to follow sound business practices, since a bank can easily verify through minimal investigation if a fake document purports to be something that never was in existence. On the other hand, verifying the authenticity of a duplicate or imitation of a genuine document is unlikely to result in discovery of the fraud, a risk an insured bank cannot control. The Bond is not intended to cover this type of forgery loss. If a bank, such as respondent, chooses not to follow sound business practices and fails to investigate, verify, examine, or even possess securities before remitting loan proceeds, it cannot successfully claim this is an insured risk and not an ordinary business loss.

Nat'l City Bank of Minneapolis v. St. Paul Fire & Marine Ins. Co., 447 N.W.2d 171, 179 (Minn. 1989).

Dakota West has cited to several dictionary definitions of the term "counterfeit" and contends that the "Buyer's Bill" is counterfeit because it is an imitation made with the intent to deceive. Dakota West also argues that the "Buyer's Bill" satisfies the definition of counterfeit because the loan officer at Dakota West believed it to be genuine.

It is well-settled that the court must first look to the language of the insurance contract when interpreting policy language. Because the subject bond defines "counterfeit," that definition controls the policy analysis. The Court aligns itself with the majority rule and adopts the reasoning of the Second and Fifth Circuit Courts of Appeal and the Minnesota Supreme Court in construing the definition of "counterfeit." It is clear that a document or writing is counterfeit if it is an imitation of or attempts to simulate another document that is authentic. It is equally clear that a loan officer's subjective belief that the "Buyer's Bill" was genuine is not determinative of whether the "Buyer's Bill" is a counterfeit document under the provisions of the bond.

In this case, Dakota West's loan loss did not result from its reliance on the similarity of Todd Horob's "Buyer's Bill" to an authentic "Buyer's Bill." Dakota West admits that the "Buyer's Bill" is not an imitation or alteration of a preexisting genuine "Buyer's Bill" issued by Lake Region Livestock that documented an actual purchase of 1,276 steers that occurred on April 15, 2005. See Docket No. 17-3, p. 2. Dakota West also admits that there was never a preexisting, genuine "Buyer's Bill" that, after being issued with true and correct terms documenting an actual purchase of livestock by H&J Livestock, was then falsely modified and submitted by fax to Dakota West on April 15, 2005. Id.

The Court finds that lending $950,000 on the basis of a faxed and unsigned "Buyer's Bill" is not the type of risk for which the "Counterfeit Share Draft, Check or Securities" provision of the bond triggers coverage. Dakota West was not deceived by an imitation of an original document of title that memorialized a sale of steers. In this case a single phone call by Dakota West to Lake Region Livestock before advancing any loan funds to H&J Livestock would have revealed that H&J Livestock had never purchased any steers. The bond issued by CUMIS was not meant to insure against these types of business practices. If a bank or credit union chooses not to follow sound business practices and fails to investigate, verify, examine, or even possess signed sales documentation before remitting loan proceeds, it cannot reasonably claim that the resulting loan loss is an insured risk and not an ordinary business risk.

The Court finds, as a matter of law, that the "Buyer's Bill" is not a "counterfeit" document as that term is defined in the bond. The Court further finds that Dakota West's loss on the $950,000 loan to H&J Livestock, based on a faxed, unsigned "Buyer's Bill," is not covered under the bond's "Counterfeit Share Draft, Check or Securities" provision.

11

### C. DOCUMENT OF TITLE

CUMIS also contends that the "Buyer's Bill" is not a "document of title" as that term is defined in the bond and, therefore, Dakota West's loan loss is not a covered claim even if the "Buyer's Bill" is deemed to be a counterfeit. The bond defines "document of title" as follows:

> "Document of title" means a bill of lading, dock warrant, dock receipt, warehouse receipt or order for delivery of goods, and any other document which in the regular course of business or financing is treated as adequately evidencing that the person in possession of it is entitled to receive, hold and dispose of the document and the goods it covers, and must purport to be issued by or addressed to a bailee and purport to cover goods in the bailee's possession which are either identified or are fungible portions of an identified mass.

See Docket No. 17-10, p. 25.

Dakota West argues that the "Buyer's Bill" is a document of title because similar "Buyer's Bills" had been received from H&J Livestock and relied upon by Dakota West's loan officers on previous occasions. Dakota West contends that these prior instances establish a course of dealing between Dakota West and H&J Livestock. Dakota West has not addressed the requirement that the document of title must "purport to cover goods in the bailee's possession which are either identified or are fungible portions of an identified mass."

The Court finds that the "Buyer's Bill" is not a "document of title" as defined in the bond. It is clear from the face of the "Buyer's Bill" that it does not purport to cover "goods" in the bailee's possession which are either identified or are fungible portions of an identified mass. The "Buyer's Bill" only refers to steers which are not identified nor are they "fungible portions of an identified mass." The "Buyer's Bill" does not identify the steers by pen number, consigner number, tag numbers, or brand. See Docket No. 17-2. This is evidenced by testimony of Dakota West's loan officer that the "Buyer's Bill" could not be used to identify which steers were sold to H&J

Livestock.  See Deposition of Scott Kueffler, Docket No. 17-4, p. 103.  The unsigned "Buyer's Bill" is a meaningless and simplistic document which does not in any manner equate with a document of title nor is it a document of any legal significance for purposes of invoking coverage under the bond.

The Court finds, as a matter of law, that the "Buyer's Bill" is not a "document of title" as defined under the coverage provisions of the bond for "Counterfeit Share Draft, Check or Securities."  The court further finds that, even if the "Buyer's Bill" is considered to be a counterfeit, Dakota West's loss on the loan to H&J Livestock is not covered under the bond's "Counterfeit Share Draft, Check or Securities" provision because the "Buyer's Bill" is not a "document of title."

## IV.     CONCLUSION

For the reasons set forth above, CUMIS's Motion for Summary Judgment (Docket No. 14) is **GRANTED**, and Dakota West Credit Union's Motion for Summary Judgment (Docket No. 22) is **DENIED**.  Let Judgment be entered accordingly.

**IT IS SO ORDERED.**

Dated this 24th day of January, 2008.

                                                       */s/ Daniel L. Hovland*
                                                       Daniel L. Hovland, Chief Judge
                                                       United States District Court